IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN REED, | ) | CASE NO. 1:20-cv-00352 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Brian Reed ("Plaintiff" or "Reed") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties.  Doc. 14.  For the reasons explained herein, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Reed filed an application for supplemental security income ("SSI")[1] on April 18, 2016.[2]

Tr. 16, 273, 470-475, 483, 574-584.  Reed alleged disability beginning on January 1, 2009.  Tr.

---

[1] Prior to filing the social security application that is the subject of the pending appeal, Reed filed an SSI application in January 2014, alleging disability beginning on October 2011, which resulted in an unfavorable decision by an ALJ dated March 21, 2016.  Tr. 16, 447-468.  Reed sought review by the Appeals Council, and on April 27, 2017, the Appeals Council denied Reed's request for review of that decision.  Tr. 503-508.

[2] Plaintiff asserts that his application was filed on June 20, 2017.  Doc. 16, p. 1, n. 1.  Defendant responds in his brief, explaining that the correct filing date for Reed's application is April 18, 2016, which was established when Plaintiff sought review of the prior ALJ decision.  Doc. 19, p. 13, n. 5; Tr. 504 (Appeals Council April 27, 2017, denial of Reed's request for review of the March 21, 2016, ALJ decision, explaining that "If you file a new claim for supplemental security income within 60 days after you receive this letter, we can use April 18, 2016, the date of your request for review, as the date of your new claim."); *see also* Tr. 40-42, 43 (discussion at hearing regarding the application filing date).

16, 469, 574.  Reed alleged disability due to severe sleep apnea, herniated and bulging disc –
thoracic and lumbar spine, crushed right ankle bone, chronic back spasms, low testosterone, high
blood pressure, acid reflux, unknown pulmonary condition, depression, bipolar disorder,
agoraphobia, and Hepatitis C.  Tr. 470, 514, 524, 597.

After initial denial by the state agency (Tr. 514-520) and denial upon reconsideration (Tr.
524-528), Reed requested a hearing (Tr. 529-531).  On November 26, 2018, a hearing was held
before an Administrative Law Judge ("ALJ").  Tr. 37-71.  On May 14, 2019, the ALJ issued an
unfavorable decision, (Tr. 13-36), finding that Reed had not been under a disability within the
meaning of the Social Security Act since April 18, 2016, the date the application was filed (Tr.
17, 30).  Reed requested review of the ALJ's May 14, 2019, decision by the Appeals Council.
Tr. 570-573.  On January 30, 2020, the Appeals Council denied Reed's request for review,
making the ALJ's May 14, 2019, decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.      Personal, vocational and educational evidence

Reed was born in 1966.  Tr. 29, 574.  He was 52 years old at the time of his November
2018 hearing.  Tr. 64.   Reed has his GED.  Tr. 64, 598. He has no past relevant work.  Tr. 64.

### B.      Medical evidence

#### 1.  Treatment history

*Physical impairments*

As summarized herein, Reed has received treatment for various physical impairments,
including problems with his left shoulder/arm, back pain, left knee and hip, swelling and pain in
his lower extremities, hepatitis C, and obstructive sleep apnea.  Reed saw various medical
professionals, with his primary medical care being provided through MetroHealth.

On March 24, 2016, Reed attended physical therapy for left shoulder pain. Tr. 1363. He reported that his shoulder felt good the day after his last visit but then, on the next day, he could not lift his arm and it hurt for a week. Tr. 1363. As a result, he had not attended physical therapy for a while. Tr. 1363. Treatment notes reflected that Reed was not compliant with his home exercise program. Tr. 1363, 1365. Reed's pain level was 0/10 at rest and 6/10 when lifting his arm. Tr. 1363. During his evaluation, Reed was stiff with a guarded posture and he had decreased cervical and upper thoracic rotation. Tr. 1363. Also, Reed had difficulty combing his hair and taking his shirt/jacket on and off and, he had pain with overhead reaching. Tr. 1364. At his next visit on March 28, 2016, Reed reported no pain after his prior session and he had been working on improving his posture. Tr. 1370. The physical therapist noted that Reed's progress had been slow. Tr. 1372. Further physical therapy sessions were recommended. Tr. 1373. Reed continued to attend physical therapy through April 18, 2016. Tr. 1377-1383, 1384-1390, 1391-1397, 1398-1404, 1405-1411, 1412-1418.

At his tenth physical therapy visit on April 18, 2016, Reed reported that he felt he had "improved 50% in pain and function since staring therapy." Tr. 1412. The physical therapist noted that Reed showed minimal improvement since starting physical therapy and the mild improvement he had with pain and range of motion was short-lived. Tr. 1414. The therapist did not feel that continued therapy was appropriate, noting that Reed had reached a plateau with little progress. Tr. 1414. The therapist indicated that Reed was scheduled to see Dr. Morton regarding the possibility of an injection, which the therapist though might help decrease Reed's symptoms so that progress could occur in therapy. Tr. 1414.

Reed saw Dr. Antwon Morton, D.O., at the PMR Clinic on April 20, 2016, regarding his back and left shoulder pain. Tr. 1419. Reed reported a history of mid to low back pain for years.

3

Tr. 1419.  His main complaint at the visit was his left shoulder pain.  Tr. 1420.  Reed was being treated with Suboxone for a prior addiction problem that started with being on pain medication for his back which progressed to heavier drugs and eventually heroin.  Tr. 1420.  Dr. Morton noted prior imaging results, including a 2014 MRI of the thoracic spine and lumbar spine that showed a mild disc bulge from the T2-T7 without significant canal or forminal stenosis and no significant interval change and right paramedian disc extrusion at L4-L5 with compression of the right L5 nerve roots.  Tr. 1420-1421.  Reed exhibited pain with trunk flexion/extension and hip flexion and rotation; limited range of motion in the hips and; 4/5 strength on the right and 3/5 strength on the left in the hips; positive straight leg raise bilaterally; positive facet load; normal sensation in upper and lower extremities; normal strength in all myotomal regions of the upper extremities; 5/5 strength in the lower extremities; normal fine motor coordination; and normal gait.  Tr. 1423. Faber's testing and pelvic rock test could not be completed due to pain.  Tr. 1423.  Dr. Morton administered a left subacromial bursa injection; started Reed on Mobic; ordered an x-ray of the left shoulder; and recommended that Reed continue with physical therapy.  Tr. 1424.

The left shoulder x-ray taken on April 20, 2016, showed no significant soft tissue bony abnormalities.  Tr. 1429.  Reed resumed physical therapy on April 21, 2016.  Tr. 1431.  During that visit, Reed reported that his left shoulder pain was a 4/10.  Tr. 1431.  Reed also reported that the shoulder injection had helped a lot with his pain and active range of motion.  Tr. 1431.  Reed continued with physical therapy for his left shoulder through June 7, 2016. Tr. 1454-1461, 1462-1469, 1470-1477, 1478-1485, 1486-1492.  During a May 12, 2016, visit, Reed reported a pain level of 5/10 and he relayed that the steroid injection was no longer helping.  Tr. 1462.  He was continuing to have functional deficits and pain.  Tr. 1462.  During his physical therapy visit on June 7, 2016, Reed reported a pain level in his left shoulder of 3/10 with reaching.  Tr. 1486.

Reed relayed that he felt that he had improved approximately 80% since starting therapy.  Tr. 1486.  He still had difficulty with reaching too high, reaching behind his back, and over-extending.  Tr. 1486.  The therapist indicated that, although Reed had not achieved his goals due to continued decreased range of motion overhead, he had greatly improved his functional range since starting physical therapy and he had good compliance with his home exercise program.  Tr. 1488.  The therapist recommended that Reed discontinue physical therapy.  Tr. 1488.

Reed saw Dr. Morton for follow up on June 22, 2016.  Tr. 1493.  Examination revealed no edema in the extremities.  Tr. 1497.  There was reduced range of motion, pain and weakness in the shoulder but normal sensation in the dermatomal regions of the bilateral upper and lower extremities; normal strength in all myotomal regions of the bilateral upper extremities; and 5/5 strength in the bilateral lower extremities.  Tr. 1497.  Fine motor coordination was normal as was Reed's gait.  Tr. 1497.  Dr. Morton recommended that Reed continue taking Mobic as needed; continue with his home exercise program; and consider a repeat shoulder injection in the future.  Tr. 1497.

Reed saw Dr. Imad Assad, M.D., for treatment of his Hepatitis C.  Tr. 1515.  When Reed saw Dr. Assad on August 10, 2016, (Tr. 1515-1527), and September 20, 2016, (Tr. 4454-4461), Dr. Assad's examination revealed no edema (Tr. 1518, 4457).

Reed saw a nurse practitioner Jacalyn Iacoboni, CNP, for a full physical examination on August 16, 2016.  Tr. 1540-1543.  On physical examination, Reed exhibited paraspinal tenderness; reduced range of motion in his spine and shoulder; muscle tone was good; and muscle strength was 5/5.  Tr. 1542.  Nurse Iacoboni's recommendations included screening for aortic abdominal aneurysm based on Reed's family medical history.  Tr. 1542.  An aorta ultrasound showed a "[m]ild degree of artherosclerotic disease[.]"  Tr. 1546.

On September 15, 2016, Reed saw Dr. Morton for follow up.  Tr. 1582.  Reed relayed that his range of motion and function had worsened in his low back and left hip area over the prior two to three weeks.  Tr. 1583.  Reed explained that his low back pain radiated across the region and he described the pain as aching in nature, rating his pain at a 4-9/10.  Tr. 1583.  His pain was worse with standing, walking, and bending and it improved with rest and injections.  Tr. 1583.  On physical examination, Dr. Morton observed no edema in the extremities; moderate decreased range of motion during examination of Reed's back; straight leg raise testing increased Reed's back pain bilaterally without radicular symptoms; and other testing caused increased back pain bilaterally.  Tr. 1587.  Reed's reflexes were 2+ in bilateral upper and lower extremities; sensation was normal; motor strength was normal in all myotomal regions of the bilateral upper extremities and 5/5 in bilateral lower extremities; fine motor coordination was normal; and gait was "slow and reciprocal[.]"  Tr. 1587.  Dr. Morton provided Reed with Toradol 60 mg and Depo Medrol 80 mg for his pain that day and prescribed a Medrol Dose Pak to be used for pain as directed.  Tr. 1587.

During an October 11, 2016, appointment with Dr. Anita Lang, M.D., regarding soreness in his mouth/tongue, on examination, Dr. Lang observed a normal gait and no edema in Reed's legs.  Tr. 1609, 1612.

On December 20, 2016, Reed saw Nurse Iacoboni along with APN Student Sarah Thompson for follow up regarding high blood pressure and difficulty sleeping.  Tr. 1662-1676.  During the visit, Reed was using a cane for ambulation; his muscle strength was 5/5; he had normal range of motion in his back and extremities; no edema in his extremities; and his motor function and sensation were normal.  Tr. 1664, 1668.

On January 17, 2017, Reed saw Valerie Ross, CNP, for a follow-up sleep medicine visit. Tr. 1677. Reed explained that he had not been tolerating his CPAP machine for the prior two months. Tr. 1678. Reed reported daytime sleepiness and naps. Tr. 1678. On examination, Nurse Ross observed no edema in the lower extremities and Reed's gait was grossly intact. Tr. 1680. Nurse Ross recommended a sleep study and discussed CPAP compliance; the need to improve sleep hygiene; and the importance of weight loss. Tr. 1680.

On February 14, 2017, Reed saw Heather A. Rainey, M.D., in the PMR Clinic for a follow-up visit regarding his pain. Tr. 1729. Reed relayed that, since his last visit in the PMR Clinic with Dr. Morton in September 2016, he was no different. Tr. 1729. He had back spasms without any precipitating event. Tr. 1729. Reed's pain was localized to his upper back, bilaterally. Tr. 1729. At times, Reed's back pain radiated into his left leg. Tr. 1729. Reed described his pain as a constant ache and he rated his pain a 7/10. Tr. 1729. Reed's pain was better with sitting and lying and worse with walking. Tr. 1729. Reed reported constant numbness in his left foot. Tr. 1729. Reed was taking/using medications for pain, including Suboxone, Voltaren gel (for his foot), and Flexeril (for back spasms). Tr. 1729. Reed reported that he was not doing his home exercises. Tr. 1729. On examination, pulses were 2+ with no edema; range of motion in the lumbar spine was reduced on flexion and extension; there was tenderness to palpation in the lumbar and thoracic spine and in the bilateral lumbar and thoracic paraspinals; strength was 5/5 on hip flexion, knee extension and flexion, and ankle dorsiflexion; Reed's sensation was decreased to light touch in the left calf; Reed walked with a cane; and seated straight leg raise was negative bilaterally. Tr. 1733-1734. Dr. Rainey advised Reed to continue with Flexeril and Voltaren gel and to use Aleve and ice/heat as needed. Tr. 1735. Dr. Rainey planned to refer Reed to aqua therapy and order a lumbar corset for Reed to use during

heavy activity.  Tr. 1735.  She discussed the importance of weight loss and planned to refer Reed

to Nutrition for a discussion regarding diet and weight loss.  Tr. 1735.

Reed saw Kathleen S. Grieser, M.D., his internal medicine physician, for follow up on

February 17, 2017.  Tr. 1740.  Reed relayed that he needed a form for his attorney.  Tr. 1740.

Reed reported having many problems, including depression.  Tr. 1740.  He indicated that he was

"still quite depressed" and was scheduled to see behavioral health the following week.  Tr. 1740.

Dr. Grieser observed that Reed looked uncomfortable and depressed.  Tr. 1741.  She discussed

this with him and indicated she would complete the form.  Tr. 1741.

During a follow-up sleep medicine visit with Nurse Ross on February 21, 2017, (Tr.

1747-1751), on examination, Nurse Ross observed no edema in the lower extremities (Tr. 1750).

Nurse Ross noted that Reed had recently had his sleep study on January 27, 2017.  Tr. 1748.

Reed was awaiting set up of a BiPAP machine.[3]  Tr. 1750.

On March 15, 2017, Reed saw Dr. Grieser regarding sores on his tongue.  Tr. 1762-1763.

Dr. Grieser prescribed a topical medication to treat the ulcers on Reed's tongue.  Tr. 1763.

On April 25, 2017, Reed saw Nurse Ross for a follow-up sleep medicine visit.  Tr. 1845.

Reed reported that he still was not sleeping well notwithstanding the various medications he was

taking.  Tr. 1845.  Reed relayed that he was only using his CPAP for 2-4 hours per night; he was

not keeping a consistent sleep schedule; and was napping during the day.  Tr. 1845.  On physical

examination, Nurse Ross observed no edema in the lower extremities.  Tr. 1847.  Nurse Ross

---

[3] "Both [a CPAP and BiPAP] deliver air pressure when you breathe in and breathe out. But a BiPAP delivers higher air pressure when you breathe in. The CPAP, on the other hand, delivers the same amount of pressure at all times. So the BiPAP makes it easier to breathe out than the CPAP."
https://www.webmd.com/sleep-disorders/sleep-apnea/bipap-overview#:~:text=Both%20deliver%20air%20pressure%20when,breathe%20out%20than%20the%20CPAP (last visited 3/26/2021).

advised Reed to use his CPAP for a minimum of 5 hours each night for 5/7 days per week. Tr. 1847.

During a May 12, 2017, appointment with Thomas Murphy, M.D., (Tr. 1840-1841), regarding Reed's testosterone levels, on physical examination, Dr. Murphy observed trace pedal edema in the extremities with no tenderness or varicosities. Tr. 1841.

On May 16, 2017, Reed saw Dr. Rainey for follow up in the PMR Clinic. Tr. 1835-1840. Reed reported that, since his visit in February 2017, he was doing a little better. Tr. 1836. He was attending land and aqua therapy and it was helping. Tr. 1836. Reed no longer needed his cane to walk; his lumbar corset helped; he was taking Flexeril sparingly; and the Voltaren gel helped. Tr. 1836. While doing a little better, Reed reported bilateral hip pain that was aching in nature and worse with walking. Tr. 1836. He was not having pain down his legs but he did get numbness in his left foot. Tr. 1836. On examination, pulses were 2+ with no edema; there was tenderness to palpation in the bilateral piriformis and bilateral greater trochanter region; range of motion was decreased in Reed's lumbar spine; strength was 5/5 on hip flexion, knee extension and flexion, and ankle dorsiflexion; and Reed's sensation was decreased to light touch in the left calf. Tr. 1838-1839. Dr. Rainey administered a greater trochanteric bursa corticosteroid injection. Tr. 1839-1840. Dr. Rainey also advised Reed to continue with Flexeril and Voltaren gel and to use Aleve and ice/heat as needed and encouraged Reed to continue with physical therapy and home exercises. Tr. 1839.

On May 17, 2017, Reed saw dermatologist Marjorie Montanez-Wiscovich, M.D., regarding a rash on his lower legs that started the day prior. Tr. 1833-1834. Reed denied any lower leg edema; he noted that, the day prior, he had been wearing a leg brace all day, which was longer than he usually wore the brace. Tr. 1834. Reed indicated that he often wore the leg brace

for pain control.  Tr. 1834.  Dr. Montanez-Wiscovich directed Reed to use a topical cream and compression stockings.  Tr. 1834.

On June 6, 2017, Reed saw Nurse Ross for a follow-up sleep medicine visit.  Tr. 1829.  Reed was not using his CPAP because he coughed every time he tried to use the mask.  Tr. 1829.  Nurse Ross observed no edema in Reed's lower extremities.  Tr. 1832.  She indicated that they would check for asthma to see if that was why Reed was having hard time using his machine.  Tr. 1832.

Reed saw Dr. Grieser on June 27, 2017, for ongoing issues with a cough, worsening reflux, and ongoing issues with his back.  Tr. 2978-2979.  Reed relayed that his back symptoms were worse after therapy.  Tr. 2979.  He was doing okay with water therapy but felt that they were overdoing it with the harder exercises.  Tr. 2979.  On examination, Dr. Grieser observed a positive straight leg raise at about 20 degrees.  Tr. 2979.  Dr. Grieser noted that Reed was scheduled to see the PMR doctor in August.  Tr. 2979.  Dr. Grieser noted that Reed was in mild distress and his back muscles were tight.  Tr. 2979.  She did not note any signs of edema.  Tr. 2979.  Reed received a Toradol injection and was prescribed Medrol.  Tr. 2979.  Follow-up testing was ordered regarding the reflux complaints.  Tr. 2979-2980.

Reed presented to the emergency room on July 5, 2017, with complaints of chest symptoms and lightheadedness.  Tr. 2976.  He was treated by Bruce Graham, D.O.  Tr. 2976.  Reed denied any lower extremity edema or pain and Dr. Graham's physical examination revealed normal peripheral perfusion and pulses, symmetric pulses to extremities, no edema, no calf tenderness, normal speech, and normal gait.  Tr. 2976, 2977.  Reed was discharged in improved condition with instructions to follow up as an outpatient.  Tr. 2978.  On July 27, 2017, Reed was seen by Mohammed Hajjiri, M.D., in the General Cardiology Clinic.  Tr. 2968-2972.

10

During Dr. Hajjiri's examination he observed no edema in the lower extremities and Reed's pulses were intact.  Tr. 2971.  Dr. Hajjiri noted that Reed was depressed.  Tr. 2972.  Reed was not interested in any additional medications.  Tr. 2971-2972.  He was interested in a possible ablation procedure.[4]  Tr. 2972.

On July 29, 2017, Reed saw Glenn Wera, M.D., for an orthopaedic consult regarding a non-displaced tibial plateau fracture on the left.  Tr. 2963-2964.  Reed sustained the injury when he fell into rocks at Edgewater Park after his knee had buckled.  Tr. 2964.  Reed was ambulatory but reported that he had had three months of knee buckling.  Tr. 2964.  He was able to stand but could not fully bear weight.  Tr. 2964.  Reed reported large painful knee swelling.  Tr. 2964.  X-rays of the left hip and left knee were taken.  Tr. 2916, 2966, 3409.  The left hip x-ray was negative for acute fracture or dislocation of the pelvis bones or left hip.  Tr. 2916, 3409.  The left knee x-ray showed sizable joint effusion and the findings suggested "an impacted step-off fracture of the lateral portion of the left tibial plateau."  Tr. 2916, 3409.

Reed saw Nurse Ross on August 1, 2017, for a sleep medicine follow up.  Tr. 2888.  Reed was still unable to tolerate his BiPAP, even for an hour due to coughing/gagging.  Tr. 2888.  Reed reported no numbness or tingling in his extremities but he reported joint pain (left knee/leg) and depression.  Tr. 2891.  Nurse Ross's physical examination showed no edema in the lower extremities; a brace on the left leg; and normal mood and affect, dress, memory, and judgment.  Tr. 2891.  Nurse Ross recommended another sleep study.  Tr. 2891.

When Reed saw Dr. Wera for follow up on August 7, 2017, regarding his left knee pain, Dr. Wera observed no edema; Reed walked with a moderate limp; his mood was depressed; his

---

[4] "Cardiac ablation uses heat or cold energy to create tiny scars in your heart to block abnormal electrical signals and restore a normal heartbeat. The procedure is used to correct heart rhythm problems (arrhythmias)." https://www.mayoclinic.org/tests-procedures/cardiac-ablation/about/pac-20384993 (last visited 3/26/2021).

coordination was normal; and he was extremely pleasant.  Tr. 2904-2905.  Reed had been using a

knee immobilizer and a cane.  Tr. 2904.  Due to his past drug use, Reed declined pain

medication.  Tr. 2904.  He was taking Suboxone and Aleve for his pain.  Tr. 2904.  Dr. Wera

indicated he reviewed imaging, noting that the left knee x-ray showed a non-displaced lateral

tibial fracture and a CT scan showed very minimal displacement in the lateral tibial plateau.  Tr.

2905.  Dr. Wera recommended non-operative management of the left knee.  Tr. 2905.

Reed saw Dr. Grieser on August 15, 2017.  Tr. 2909.  Dr. Grieser observed that Reed was

in mild distress.  Tr. 2910.  She did not note swelling or edema in Reed's legs.  Tr. 2910.  Due to

the tibial fracture, Dr. Grieser ordered a walker for Reed to use.  Tr. 2910, 2912.

Reed also saw Dr. Rainey on August 15, 2017.  Tr. 2915.  Reed relayed that he was not

doing well.  Tr. 2915.  Following his tibial plateau fracture, he was in a knee mobilizer.  Tr.

2915.  He was supposed to be non-weight bearing but was not following that recommendation.

Tr. 2915.  Before his fracture, he had moved from water to land therapy.  Tr. 2915.  Water

therapy provided some relief but land therapy was making his pain worse.  Tr. 2915.  Reed's

pain was along his lateral left hip and in his groin.  Tr. 2915.  His pain was aching, intermittent

and worse with ambulation.  Tr. 2915.  On examination, Dr. Rainey observed no edema and

Reed's pulses were 2+.  Tr. 2919.  The musculoskeletal examination was limited due to the knee

immobilizer; however, Dr. Rainey observed no lumbar spine or paraspinal tenderness; tenderness

to palpation in the left greater trochanteric bursa; 5/5 strength in the lateral lower limbs;

sensation was intact to light touch; and there was lateral hip pain with log roll.  Tr. 2919-2920.

Dr. Rainey administered a greater trochanteric bursa corticosteroid injection.  Tr. 2921.  Dr.

Rainey also advised Reed to continue with Flexeril and Voltaren gel and to use Aleve and

ice/heat as needed. Tr. 2921. She noted that Reed could not do his home exercises because he was non-weightbearing on the left. Tr. 2921.

Reed saw Dr. Wera again on August 21, 2017. Tr. 2947. Reed was using a brace and minimizing weightbearing activity. Tr. 2947. He reported mild dull pain in his left knee. Tr. 2947. Dr. Wera indicated that Reed's fracture was healing and there was no further displacement. Tr. 2947. Dr. Wera advised Reed to continue to minimize weightbearing activity but he should work on range of motion. Tr. 2947.

During a September 5, 2017, appointment with Dr. Hajjiri regarding the ablation procedure, on examination, Dr. Hajjiri observed no lower extremity edema and Reed's pulses were intact. Tr. 2941, 2943.

Reed saw Dr. Wera on October 16, 2017, for follow up regarding his tibial fracture. Tr. 3266. Reed had been using a cane and reported the knee was nonpainful. Tr. 3266. X-rays showed no further displacement. Tr. 3266. On examination of the right knee, range of motion was from 3-110 degrees; the lateral joint was nontender; and there was no effusion, edema, or fluctuance. Tr. 3266. Dr. Wera concluded that the fracture had healed and advised Reed that he could perform activity as tolerated and follow up if needed. Tr. 3266-3267.

On November 6, 2017, Reed saw Nurse Ross for a follow-up appointment regarding his sleep issues. Tr. 3272. Reed relayed that he had not been using his "old" CPAP machine because it was uncomfortable and never received a new machine. Tr. 3272. Reed had an appointment scheduled to see an ENT surgeon to discuss nasal/sinus issues. Tr. 3272. During the visit, Reed reported no numbness or tingling in his extremities; no joint pain; and no anxiety or depression. Tr. 3275. On examination, Nurse Ross noted +1 edema in the lower extremities and normal mood and affect, dress, memory, and judgment. Tr. 3275.

During a November 8, 2017, ENT appointment with Gia Marotta, M.D., Dr. Marotta observed that Reed moved all his extremities and ambulated without assistance. Tr. 3289. Dr. Marotta concluded that Reed had a nasal obstruction that was causing VPAP/CPAP intolerance. Tr. 3290. Dr. Marotta discussed possible treatment options with Reed. Tr. 3290. The plan included proceeding with endoscopic septoplasty and inferior turbinate reduction. Tr. 3291.

During a follow-up cardiology appointment with Lisa Lanzara, CNP, on November 15, 2017, Reed relayed that he had been very depressed, noting he had been fighting Caresource and SSI. Tr. 3295. He reported severe sleep apnea and that he did not sleep well. Tr. 3295. Reed denied chest pain, palpitation, leg swelling, or syncopal episodes but he did have dizziness and lightheadedness with position changes and he had shortness of breath with exertion. Tr. 3295. Nurse Lanzara observed that Reed's extremities were normal with no deformities, edema or discoloration. Tr. 3299. Reed did not schedule the ablation procedure because Dr. Hajjiri was leaving and he wanted to establish care with a new physician (Dr. Ziv) prior to proceeding with the procedure. Tr. 3303. Nurse Lanzara recommended that Reed proceed with an ECG, continue with his medications, and follow up with Dr. Ziv in three months. Tr. 3303.

Reed saw Dr. Grieser on January 8, 2018, with complaints of memory problems and problems sleeping. Tr. 3495. Dr. Grieser did not note any edema. Tr. 3495. Dr. Grieser made a neurology service request to address Reed's memory loss and sleep apnea issues. Tr. 3496.

At a January 18, 2018, appointment for mental health treatment, Reed's psychiatrist, Dr. Robert Segraves, M.D., observed that Reed was walking with a cane and appeared to be in obvious pain. Tr. 3343, 3350.

Later that month, on January 23, 2018, Reed saw Dr. Rainey for a follow-up visit in the PMR clinic. Tr. 3488. Reed had most recently been seen by Dr. Rainey on November 21, 2017.

14

Tr. 3488.  Reed's condition remained unchanged since his last visit – he had pain across his low back on both sides that went into his buttocks with some radiation into his left thigh and some numbness in his left foot.  Tr. 3488.  Dr. Rainey had ordered an EMG and CT scan.  Tr. 3488.  Reed's insurance denied the CT scan and Reed had missed his EMG appointment.  Tr. 3488.  Reed was using the Voltaren gel and used the Flexeril occasionally.  Tr. 3488.  Since starting a new medication for his Hepatitis, Reed had been trying to avoid other medications.  Tr. 3488.  On physical examination, Dr. Rainey observed no edema and 2+ pulses.  Tr. 3491-3492.  The musculoskeletal lumbosacral spine examination showed no lower extremity muscle atrophy or fasciculations; there was tenderness to palpation in the lower lumbar spinals, bilateral lumbar paraspinals, bilateral piriformis, and left greater trochanter region; no tenderness to palpation in the SI joint; reduced range of motion; 5/5 strength with hip flexion, knee extension, knee flexion, ankle dorsiflexion, and ankle plantarflexion; normal reflexes; and sensation was "[i]ntact in lower extremity L2-S2 radicular distributions to light touch[.]"  Tr. 3493.  There was reduced range of motion in the lumbar spine and there were positive facet loading/lumbar Spurling's tests on the right and left.  Tr. 3493.

On February 21, 2018, Reed saw Saba Haq, M.D., in the internal medicine department with complaints of swelling in his legs bilaterally and feeling depressed.  Tr. 3485.  The swelling had started earlier that week.  Tr. 3485.  Dr. Haq observed a normal mood and affect, normal behavior and normal judgment and thought content.  Tr. 3487.  Dr. Haq ordered a bilateral ultrasound leg scan, echocardiogram, and prescribed Lasix.  Tr. 3487.  A few days later, on February 23, 2021, during a presurgical evaluation for septoplasty surgery scheduled with Dr. Marotta, physical examination revealed "[n]o gross or obvious abnormalities" in Reed's extremities.  Tr. 3477-3478, 3481.  There were no motor deficits and sensation was grossly

intact.  Tr. 3481.  Reed reported low back pain with a severity level of 8.  Tr. 3481.  On February 28, 2018, Reed returned to the internal medicine department with complaints that his legs/thighs were swollen following a shot he had received in his back.  Tr. 3475.  Reed saw Carol D'Souza, M.D.  Tr. 3475.  Reed had an ultrasound performed that was negative for "dvt" and his echocardiogram was normal.  Tr. 3475.  On examination, Reed's extremities were 2+.  Tr. 3476.  Dr. D'Souza diagnosed pedal edema and advised Reed to elevate his feet and to keep his appointment with his primary care physician.  Tr. 3476.

Reed saw Dr. Grieser on March 6, 2018, for follow up regarding his bilateral leg swelling.  Tr. 3472.  Reed relayed that his symptoms had improved.  Tr. 3472.  Dr. Grieser observed that Reed was in mild distress and he had +2 edema.  Tr. 3474.  During a visit with Dr. Asaad on March 12, 2018, Dr. Assad noted no edema in the lower extremities.  Tr. 3467, 3470.

Reed complained of the swelling in his legs when he saw Dr. Rainey on March 20, 2018.  Tr. 3460.  Reed reported he had not been doing well and he had a lot of swelling in his legs.  Tr. 3460.  His back pain was about the same.  Tr. 3460.  Dr. Rainey's physical examination noted no edema and 2+ pulses.  Tr. 3464.  Reed's range of motion in the lumbar spine was reduced.  Tr. 3465.  He had some tenderness to palpation in the spine and positive facet loading/ lumbar Spurling's tests on the right and left.  Tr. 3465.  Dr. Rainey indicated that she would refer Reed to water therapy again.  Tr. 3466.

Reed saw Lisa Toth, APRN-CNP, on March 22, 2018, regarding the swelling in his legs.  Tr. 3456.  He relayed that, about five days earlier, he started to have redness in the left lower leg.  Tr. 3456.  The medication that Reed was taking for the swelling was providing mild relief.  Tr. 3456.  Dr. Grieser had recommended that he wrap his legs with ACE bandages.  Tr. 3456.  Reed tried doing that and had some improvement but he was concerned about the redness that had

developed.  Tr. 3456.  Nurse Toth's examination revealed 1+ pitting edema in the lower right

extremity.  Tr. 3458.  Also, there was 2+ pitting in the lower left extremity, +erythema, warmth

and tenderness to palpation.  Tr. 3458.

Reed saw Nurse Ross on March 26, 2018, regarding his sleep apnea.  Tr. 3451.  During

that visit, Nurse Ross observed that Reed has +1 bilateral edema in the lower extremities.  Tr.

3455.  Reed had a normal mood, affect, dress, memory, and judgment.  Tr. 3455.

Upon Dr. Grieser's referral, on March 28, 2018, Reed saw Chhaya Patel, M.D., in

neurology regarding his memory problems.  Tr. 3439.  Dr. Patel observed normal muscle

strength bilaterally in the upper and lower extremities with some limitation raising his leg due to

back pain.  Tr. 3444.  Dr. Patel observed a normal gait and station and noted that Reed had a

cane with him at the appointment but Reed was able to walk without his cane.  Tr. 3444.  Dr.

Patel noted that Reed's past drug abuse, sleep apnea, and psychiatric conditions could be

contributing to his memory problems.  Tr. 3444.  Dr. Patel recommended further

neuropsychological testing to better assess the nature of Reed's cognitive problems.  Tr. 3445.

Also, on March 28, 2018, Reed saw Dr. Ziv in the cardiology department regarding

Reed's SVT (supraventricular tachycardia).  Tr. 3446.  Dr. Ziv noted that an ablation procedure

had been planned.  Tr. 3446.  Reed had started taking metoprolol with no episodes or side

effects.  Tr. 3446.  On examination, Dr. Ziv observed no edema in Reed's extremities and pulses

were 2+ in upper and lower extremities bilaterally.  Tr. 3448.  Dr. Ziv assessment was SVT.  Tr.

3448.  Dr. Ziv indicated that Reed was doing well on metoprolol and they would discuss ablation

in the future if the medication did not work well.  Tr. 3448.

Upon Dr. Rainey's referral, Reed returned to physical therapy on April 9, 2018, for an

evaluation.  Tr. 4770.  Reed exhibited a "[m]oderate antalgic" gait "pattern with decreased

stance time on right lower extremity." Tr. 4771.  Reed continued with physical therapy throughout May 24, 2018.  Tr. 4775-4777, 4778-4780, 4781-4783, 4784-4786, 4787-4789, 4790-4792, 4795-4797, 4798-4800, 4801-4803, 4804-4806, 4808-4810.  At Reed's May 24, 2018, session, the therapist remarked that Reed "made minimal progress with therapy, partly due to poor compliance and partly due to a myriad of health issues, including sleep apnea, mental health issues, etc." Tr. 4809.  At that visit, Reed requested to discontinue therapy with the hope that he would return after addressing his other health issues.  Tr. 4809.  At Reed's request, he was discharged from therapy on May 24, 2018.  Tr. 4809.

On April 17, 2018, Reed saw Dr. Grieser regarding his swollen ankles/edema.  Tr. 3436. Reed was using the stockings with good effect; he was not interested in doing injections for his veins.  Tr. 3436.  Reed indicated he needed a letter for disability.  Tr. 3436.  Dr. Grieser observed +2-3 edema.  Tr. 3437.  She noted that Reed's echo was normal and directed Reed to continue with diuretics and support stockings.  Tr. 3437.  Her diagnoses were venous insufficiency of both lower extremities and displacement of lumbar intervertebral disc without myelopathy.  Tr. 3437.

On April 25, 2018, Reed was seen in the emergency room with reports of leg numbness that started that morning and vision changes (light sensitivity/blurred vision) over the prior four days.  Tr. 3416, 3421.  Reed also reported leg swelling and a headache from straining his eyes. Tr. 3421.  On examination, Reed was able to move all four extremities, there was no edema or calf tenderness.  Tr. 3423.  Reed was alert and oriented; his strength was equal and 5/5 bilaterally in the upper and lower extremities and there were no sensory deficits to light touch bilaterally in the lower extremities.  Tr. 3423.  The emergency room impression was paresthesia of lower extremity and Reed was directed to follow up with his primary care physician and other specialists.  Tr. 3424.

On May 8, 2018, Reed saw Dr. Rainey for follow up in the PMR clinic. Tr. 3407. Reed relayed he has been painting a week prior and had back and leg numbness for which he sought emergency room treatment. Tr. 3408. He relayed that he no longer had the numbness. Tr. 3408. However, he was having spasms in his thoracic spine. Tr. 3408. At that time, he was attending water therapy. Tr. 3408. Reed denied pain down his legs. Tr. 3408. Reed's primary care physician had put him on Naproxen which he took on occasion, primarily for headaches. Tr. 3408. He was still taking Flexeril and using Voltaren gel. Tr. 3408. On examination, Dr. Rainey observed no edema. Tr. 3413. Reed's lower extremities had normal strength, intact sensation, and no muscle atrophy. Tr. 3413. There was some reduced range of motion with extension of the lumbar spine. Tr. 3413. Facet loading/ lumbar Spurling's tests were negative on the right and left. Tr. 3413. There was some tenderness to palpation over the spine. Tr. 3413.

When Reed saw Dr. Grieser on May 22, 2018, he complained of ongoing GERD issues; weakness in his legs; memory issues; and issues using his CPAP. Tr. 3405. On examination, Dr. Grieser noted +2 edema. Tr. 3406. Diagnoses for the visit were GERD and localized edema. Tr. 3406. Dr. Grieser prescribed Lasix for the edema. Tr. 3406.

During Reed's July 24, 2018, office visit for treatment of Hepatitis C, on musculoskeletal examination, Virginia Morrison, APRN-CNP, observed a normal range of motion and +1 pitting edema. Tr. 3598.

On August 17, 2018, Reed saw Andre Cassell, M.D., in the PMR clinic for his low back pain. Tr. 3629. On examination, Dr. Cassell observed no edema in the extremities; there was tenderness to palpation of the legs and lower back. Tr. 3629. Dr. Cassell recommended

tizanidine for muscle spasms and Lyrica for nerve pain and chronic pain but advised Reed to check with his primary care physician to confirm that taking Lyrica was okay.  Tr. 3629.

During a follow-up visit with Dr. Patel in the neurology department on August 16, 2018, regarding Reed's memory issues, Reed relayed he underwent neuropsychological testing and he was informed that his memory was okay but he had issues with concentration and his sleep apnea might be contributing to his cognitive issues.  Tr. 3631.  Dr. Patel planned to obtain a copy of the testing results.  Tr. 3631, 3638.  Dr. Patel recommended that Reed continue taking vitamin B12 due to insufficient B12 levels.  Tr. 3631, 3638.  During the visit, Dr. Patel observed that Reed had normal strength (5/5) in his lower extremities; some limitation raising legs due to back pain but normal (5/5) strength throughout; normal muscle tone and bulk; and intact sensation.  Tr. 3637.  Dr. Patel noted that Reed brought a cane with him but Reed could walk without a cane and had normal gait and station.  Tr. 3637.

Reed saw Dr. Cassell again on September 18, 2018.  Tr. 4812.  Reed indicated the tizanidine was not helping with his muscle spasms and he did not obtain approval for Lyrica because of the abuse potential.  Tr. 4812.  Reed discussed his chronic lower leg swelling and was tearful during the appointment, explaining that his son was causing him a lot of stress but his son was one of the only thing that kept him "going on."  Tr. 4812.  Reed relayed that he wore a back brace.  Tr. 4812. On examination, Dr. Cassell observed that Reed had normal extremities, with no edema, and that his strength in hip flexion and knee extension was "at least antigravity." Tr. 4812.  There was tenderness to palpation of the low back.  Tr. 4812.  Dr. Cassell noted that they were running out of options, noting, however, that Reed might benefit from a spinal cord stimulator.  Tr. 4812.  Dr. Cassell was not sure the stimulator would be approved but he was interested in getting an opinion from the pain and healing center.  Tr. 4812-4813.  Dr. Cassell

made some adjustments to Reed's medication to see if it would provide Reed more pain relief. Tr. 4813.

On September 24, 2018, Reed saw Nurse Ross for follow up.  Tr. 4820.  Nurse Ross observed "trace edema" in the lower extremities.  Tr. 4824.  Reed also saw Dr. Grieser on September 24, 2018, with complaints of ongoing pain and sleep issues.  Tr. 4830.  Dr. Grieser observed +2 edema.  Tr. 4831.  Dr. Grieser prescribed medication for the edema.  Tr. 4832.

When Reed saw Nurse Morrison for Hepatitis C treatment on October 10, 2018, Nurse Morrison observed that Plaintiff had moved slowly, had back pain, was able to sit and lie on the table but swayed slightly when standing up and felt shaky when standing up.  Tr. 4841, 4843. However, Reed had normal range of motion and exhibited no edema.  Tr. 4844.

On October 23, 2018, Reed saw Steven M. Houser, M.D., in the ENT department for nasal congestion and obstruction.  Tr. 4850.  During that visit, Dr. Houser observed that Reed ambulated without assistance. Tr. 4854.

*Mental impairments*

Reed received mental health treatment primarily through medical providers at MetroHealth and Signature Health.  Duane Adkins, a chemical dependency counselor, Patricia Janice, a therapist, and psychiatrist Dr. Robert Segraves, were some of the medical providers included in Reed's treatment team at Signature Health.  *See e.g.*, Tr. 1127.  Reed's sobriety date is July 5, 2013.  Tr. 51, 968.

 In April 2016, Dr. Segraves diagnosed Reed with bipolar disorder, unspecified; agoraphobia with panic disorder; and opioid dependence, in remission.  Tr. 963, 968.  Dr. Segraves noted that Reed appeared despondent but he looked "much less depressed than in the past[.]"  Tr. 963.  On examination, Dr. Segraves also observed that Reed was cooperative but

lethargic; his muscle strength and tone and gait were within normal limits; his attention and concentration were sustained; his speech was slow and monotone; his memory and judgment and insight were within normal limits.  Tr. 962.  Dr. Segraves noted that the combination of Abilify and Wellbutrin appeared to be working and Reed was not interested in changing medications.  Tr. 964.  Reed was also prescribed Gabapentin and Suboxone at that time.  Tr. 962.

During an April 2016 session with Mr. Adkins, Reed relayed that he was starting to isolate and was focusing on his disability claim.  Tr. 1041.  Reed reported that he wanted to use drugs but called his sponsor and attended a meeting.  Tr. 1041.

During the summer of 2016, Dr. Segraves noted that Reed was having a difficult time due to activity going on in his son's life.  Tr. 973, 977, 982.  Also, Reed had separated from his girlfriend.  Tr. 982.  During an August 2016, appointment with Dr. Segraves, Reed continued to appear despondent with sustained attention and concentration.  Tr. 986.  Reed walked with a limp.  Tr. 987.  He relayed his girlfriend left him; he had a bad disk; social security was denied; he was living with his mom; his agoraphobia was acting up; and he had considerable anxiety.  Tr. 987-988.

On August 11, 2016, Reed was seen at MetroHealth for a mental health assessment.  Tr. 1528.  Reed relayed that he had been receiving psychiatric medication and Suboxone treatment through Signature Health but he was interested in psychotherapy for behavioral problems.  Tr. 1528.  Reed reported that he was having panic attacks when in crowded spaces, depressive symptoms, irritability, anxiety symptoms, and issues with memory.  Tr. 1528.  Reed felt that his symptoms were worsening and his medications were not working.  Tr. 1528.  Reed was instructed to follow up with his medication provider and to see a therapist to gain coping skills necessary to increase his functioning in the community.  Tr. 1535.

In October 2016, Dr. Segraves observed that Reed was despondent with sustained attention and concentration and no abnormal/psychotic thoughts.  Tr. 996.  Reed continued to have numerous life stressors, e.g., financial, girlfriend leaving, chronic pain.  Tr. 998.  Dr. Segraves noted it was difficult to assess the degree of Reed's depression "in view of desire for disability[.]"  Tr. 998.  Dr. Segraves added low dose Celexa to Reed's medications.  Tr. 998.

During an October 2016 appointment with his therapist Ms. Janis, Reed reported that he was isolating at home, watching television and assisting his mom as much as he was able to.  Tr. 1141.  Reed's affect was blunted.  Tr. 1141.  He was preoccupied with anxiety and worry regarding his mental health symptoms and family stressors.  Tr. 1141.

During a February 2, 2017, visit with Dr. Segraves, Reed walked with a limp.  Tr. 1011.  Dr. Segraves observed that Reed's mood and affect was dysphoric; he was cooperative and had sustained attention and concentration.  Tr. 1011.  There were no abnormal/psychotic thoughts; Reed's memory was intact; and his judgment and insight were fair.  Tr. 1011.  Reed expressed relief that his son was progressing well in his drug abuse program.  Tr. 1013.  The cold weather was not helping with Reed's pain.  Tr. 1013.  Also, he had a flat tire and had to walk three blocks.  Tr. 1013.  Dr. Segraves indicated that Reed's depression was in partial remission, noting that the evaluation was "complicated by acute pain[.]"  Tr. 1013.

During a visit with Dr. Segraves on June 22, 2017, Reed reported increased irritability, depression, and hopelessness.  Tr. 2511.  Dr. Segraves increased Reed's Celexa.  Tr. 2511.

When Reed saw Dr. Segraves in September 2017, Dr. Segraves observed that Reed was cooperative: he had sustained attention and concentration; his mood and effect was euthymic; he had normal speech, normal language, normal associations; his thought process was goal-directed, his fund of knowledge was normal; and his judgment and insight were fair.  Tr. 3157.  Dr.

Segraves noted that Reed limped.  Tr. 3157.  Reed was having no problem with anxiety.  Tr. 3160.  Dr. Segraves' observation were similar in subsequent months, except he noted that Reed's mood and affect was "in pain" and Reed reported problems with his memory and difficulty finding words.  Tr. 3165 (October 2017); Tr. 3330-3331 (November 2017); Tr. 3338-3339 (December 2017); Tr. 3346 (January 2018).

In October 2017, Dr. Segraves indicated that Reed was in severe pain and it was difficult to assess Reed's depression in light of his severe pain.  Tr. 3168, 4767.  Dr. Segraves noted "no complaints of agoraphobia on this visit-with severe pain minimal desire to leave home[.]"  Tr. 3168, 4767.  Dr. Seagrave's increased Reed's Prozac dose.  Tr. 3168, 4767.  During Reed's November 2017 visit with Dr. Seagrave, Reed's Prozac was discontinued following Reed's reports that he felt like a zombie on Prozac.  Tr. 3333; *see also* Tr. 3326 (November 2017 Janis counseling notes, indicating that Reed felt like a zombie on his medications).  In December 2017, Dr. Segraves noted that Reed's bipolar disorder was stable and his agoraphobia was in remission.  Tr. 3342.  Reed was experiencing severe pain following a fishing adventure.  Tr. 3342.  In January 2018, Dr. Segraves again observed that Reed was in severe pain.  Tr. 3350.  Reed was using a cane and was in "obvious pain[.]"  Tr. 3350.

Reed continued to see Dr. Segraves through at least October 2018, with Dr. Segraves observing that Reed was generally cooperative but reported pain; his attention and concentration were sustained; his mood and affect were "dysphoric" or "dysphoric, angry"; his speech, language, thought process, associations, fund of knowledge, and judgment and insight were within normal limits; he had no abnormal/psychotic thoughts; and his recent and remote memory were intact.  Tr. 3715-3716 (March 2018); Tr. 3731-3732 (May 2018); Tr. 3739-3740 (June 2017); Tr. 3747-48, 3750-3751 (July 2018); Tr. 3755-56 (August 2018), Tr. 3763-3764, 4877-

78, 4881 (September 2018); and Tr. 4885-86 (October 2018).  Dr. Segraves observed Reed with

a normal gait (Tr. 3715) but he also observed Reed walking with a cane (Tr. 3731, 3739, 3747,

3755, 3763, 4877, 4885).  Reed's complaints included his depression, pain, family stressors,

sleep issues, and issues with his focus and memory.  *See e.g.*, Tr. 3751, 3759, 3768.

In July 2018, Reed saw Stephanie Towns, Psy.D., with University Hospitals for a

neuropsychological evaluation based on his reported cognitive difficulties.  Tr. 3507-3508, 3640-

3642.  Dr. Towns found that Reed "demonstrated impaired contextual verbal learning and

speeded word reading[]"; "[r]elative weaknesses . . . on measures of processing speed, visual

recognition, and fine motor dexterity when using the right hand[]"; "recall of contextual verbal

information was in the borderline range, [but] he recalled most of the details initially learned[]"

and "[p]erformance was within normal limits for verbal and visual memory, attention, executive

functioning, language, visuospatial, and fine motor dexterity when using his left hand."  Tr.

3507, 3641.  Dr. Towns indicated that "[t]he present pattern of findings, in the context of the

reported history, [was] consistent with mild attentional deficits."  Tr. 3507, 3642.  She stated that

"[t]he most likely etiology for these difficulties is [Reed's] mood symptoms[]" and indicated

that, "[o]ther factors that might be contributing to the clinical presentation include[d] poor sleep

quality and currently untreated sleep apnea."  Tr. 3642.

### 2.  Opinion evidence

#### ***Physical impairments***

#### Drs. Grieser and Sousa

Plaintiff asserts that opinions regarding his physical impairments were rendered by two

treating physicians, Dr. Kathleen Sousa and Dr. Kathleen Grieser.  Doc. 16, pp. 7, 9-10, 16.

While Plaintiff refers to Dr. Sousa as a treating physician, the medical records that he cites to

relate to treatment rendered by Dr. Kathleen Grieser.  Doc. 16, p. 19 (citing Tr. 1832, 1853, 3405, 3472, 3495, 3506, 4830)).  Thus, it is not clear that Dr. Sousa had an ongoing treatment relationship to qualify her as "treating physician."  For purposes of summarizing the medical opinion evidence, the two physical capacity assessments that Plaintiff attributes to Dr. Sousa as well as the letter authored by Dr. Grieser are included here under the sub-heading of "Drs. Grieser and Sousa."   Given the fact that Dr. Grieser's middle initial is "S," (Tr. 3395), it may be that "Dr. Kathleen S̲ousa," who Plaintiff asserts authored the two physical capacity evaluations (Tr. 912-913, Tr. 4893-4894), is Dr. Kathleen S̲. Grieser.  Nevertheless, for purposes of the Court's analysis, the Court refers to them separately.

### *February 2017*

In the Medical Source Statement: Patient Physical Capacity completed on February 7, 2017, Dr. Sousa opined that Reed was limited to lifting/carrying up to 10 pounds occasionally and zero pounds frequently; he could stand/walk for a total of 1 hour during an 8-hour workday and only 15 minutes without interruption; he could sit for a total of 1 hour during an 8-hour workday and only 15 minutes without interruption; he could rarely climb, balance, stoop, crouch, kneel or crawl; and he could rarely reach or push/pull and frequently perform fine or gross manipulation.  Tr. 912-913.  Dr. Sousa opined that the following environmental restrictions affected Reed's impairment – heights, moving machinery, temperature extremes, and noise.  Tr. 913.  Dr. Sousa indicated that Reed had been prescribed a cane, brace and TENS unit.  Tr. 913.  Dr. Sousa opined that Reed would need to be able to alternate positions between sitting, standing, and walking at will.  Tr. 913.  Dr. Sousa rated Reed's pain as severe and indicated that his pain interfered with his concentration and would cause him to be off task and absenteeism.  Tr. 913.  Dr. Sousa also indicated that Reed would need to elevate his legs at will to 45 degrees

and would need an additional four to six hours of rest time during an average day.  Tr. 913.

While somewhat illegible, Dr. Sousa's comments include references to back pain; an inability to

stay in one position for long; and problems concentrating due to pain.  Tr. 912-913.

*April 2018*

On April 17, 2018, Dr. Grieser authored a "to whom it may concern" letter wherein she

stated that Reed was under her care and he had "chronic venous insufficiency with edema, he

may have an additional element of lymphedema[.]  He needs to wear support stockings and

should not undergo prolonged standing due to this."  Tr. 3395.

*November 2018*

In the Medical Source Statement: Patient Physical Capacity completed on November 9,

2018, Dr. Sousa opined that Reed was limited to lifting/carrying less than 5 pounds occasionally

and zero pounds frequently; he could stand/walk for a total of 1/2 an hour during an 8-hour

workday and zero hours without interruption; he could sit for a total of 3 hours during an 8-hour

workday and less than 1 hour without interruption; he could rarely climb, balance, stoop, crouch,

kneel or crawl; and he could rarely reach or push/pull and occasionally perform fine or gross

manipulation.  Tr. 4893-4894.  Dr. Sousa opined that the following environmental restrictions

affected Reed's impairment – heights, moving machinery, temperature extremes, and noise.  Tr.

4894.  Dr. Sousa indicated that Reed had been prescribed a cane.  Tr. 4894.  Dr. Sousa opined

that Reed would need to be able to alternate positions between sitting, standing, and walking at

will.  Tr. 4894.  Dr. Sousa rated Reed's pain as severe and indicated that his pain interfered with

his concentration and would cause him to be off task and absenteeism.  Tr. 4894.  Dr. Sousa also

indicated that Reed would need to elevate his legs at will to 45 degrees and would need an

additional one to two hours of rest time during an average day.  Tr. 4894.  While somewhat

illegible, Dr. Sousa's comments include references to balance issues; pain with prolonged sitting; sleep apnea; fatigue; and chronic swelling.   Tr. 912-913.

Drs. Bolz and Klyop

On July 5, 2017, state agency reviewing consultant Dr. William Bolz, M.D., completed a physical RFC assessment.  Tr. 477-479.  Dr. Bolz opined that Reed had the following exertional limitations: he could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and he was limited in his bilateral lower extremities to frequently operating foot controls. Tr. 478.  Dr.  Bolz opined that Reed had the following postural limitations: occasionally climbing ramps/stairs, stooping, kneeling, crouching, and crawling; frequently balancing; and never climbing ladders/ropes/scaffolds.  Tr. 478-479.  Dr. Bolz explained that the postural limitations were due to back pain.  Tr. 479.  Dr. Bolz opined that Reed had the following environmental limitations: he had to avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases, poor ventilation, etc.; and he had to avoid even moderate exposure to dangerous machinery or unprotected heights.  Tr. 479.

Upon reconsideration, on October 26, 2017, state agency reviewing consultant Dr Gerald Klyop, M.D., completed a physical RFC assessment.  Tr. 496-498.  Dr. Klyop agreed with the opinions rendered by Dr. Bolz.  Tr. 477-479, 496-497.

### *Mental impairments*

Dr. Segraves

Dr. Segraves authored or co-signed at least three opinions regarding Reed's mental functional capacity.  Tr. 914-915, 2875-2877, 4891-4892.

*February 2017*

In February 2017, Ms. Janis, Reed's therapist, and Dr. Segraves co-authored a Mental Source Statement ("MSS") – Mental Capacity form.  Tr. 914-915.  The following diagnoses were listed: agoraphobia with panic disorder; bipolar disorder, unspecified; and opioid dependence in remission.  Tr. 915.  In the February 2017 MSS, they rated Reed's functional abilities in 32 areas.  Tr. 914-915.  In 8 of the areas, Ms. Janis and Dr. Segraves opined that Reed had no or mild limitations. Tr. 914-915.  In the remaining 24 areas, they opined that Reed had moderate, marked or extreme limitations.  Tr. 914-915.

*June 2017*

In June 2017, Dr. Segraves completed a Mental Status Questionnaire.  Tr. 2875-2877.  Dr. Segraves listed Reed's diagnoses as bipolar disorder and opioid dependence.  Tr. 2876.  Dr. Segraves described Reed's mood and affect as despondent and, he indicated that Reed was withdrawn socially and, he was slow to adapt.  Tr. 2875-2876.  Dr. Segraves described Reed's judgment as fair.  Tr. 2875.  With respect to other areas, Dr. Segraves findings were generally normal.  Tr. 2875-2876.  For example, Dr. Segraves described Reed's appearance; flow of conversation and speech; ability to remember, understand and follow instructions; ability to maintain attention; and ability to react to pressures in a work setting involving simple and routine, or repetitive tasks as being within normal limits ("WNL").  Tr. 2875-2876.  Dr. Segraves noted no signs or symptoms of anxiety or thinking disorders.  Tr. 2875.  Dr. Segraves opined that Reed would be able to manage any benefits.  Tr. 2876.  And, with respect to Reed's ability to "[s]ustain concentration, persist at tasks, and complete them in a timely fashion[,]" Dr. Segraves opined that Reed "could cope at [a] low to normal pace job[.]"  Tr. 2876.

*November 2018*

In November 2018, Tim Natale, a mental health program assistant, and Dr. Segraves co-authored a Mental Source Statement ("MSS") – Mental Capacity form.  Tr. 4891-4892.  The following diagnoses were listed: major depression, moderately severe; rule out bipolar disorder; opiate use disorder; and chronic pain, severe.  Tr. 4892.  In the November 2018 MSS, they rated Reed's functional abilities in 32 areas.  Tr. 4891-4892.  In 6 of the areas, Mr. Natale and Dr. Segraves opined that Reed had no or mild limitations. Tr. 914-915.  In the remaining 26 areas, they opined that Reed had moderate, marked or extreme limitations.  Tr. 4891-4892.  They stated "This significantly impacts [Reed's] ability to function through basic daily activities [and] sustain independence."  Tr. 4892.

Drs. Zeune and Foulk

On July 14, 2017, state agency psychological consultant Courtney Zeune, Psy.D., completed a psychiatric review technique ("PRT") (Tr. 475-476) and Mental RFC assessment (Tr. 479-480).  In the PRT, Dr. Zeune opined that Reed was moderately limited in his ability to understand, remember, or apply information; interact with others; concentrate, persist or maintain pace; and adapt or manage oneself.  Tr. 476.  With respect to Reed's Mental RFC assessment, Dr. Zeune adopted the mental RFC from the ALJ decision dated March 21, 2016.  Tr. 480.  The March 21, 2016, mental RFC limited Reed to:

> [S]imple routine tasks or tasks that would take more than one month but up to three months to learn; low-stress tasks, which means no high production quotas, no piece-rate work, no work involving arbitration, confrontation, negotiations, or supervision, and no commercial driving; and only superficial interpersonal interactions with the public, which means no intimate or intense public contact.

Tr. 456-457.

Upon reconsideration, on October 25, 2017, state agency psychological consultant Lisa Foulk, Psy.D., reached the same findings as Dr. Zeune.  Tr. 493-494, 498.

**C.      Testimonial evidence**

**1.      Plaintiff's testimony**

Reed testified and was represented by counsel at the hearing.[5]  Tr. 40, 47-63, 64.  Reed discussed the various specialists that he sees, including a cardiologist for SVT, liver specialist for Hepatitis C, pulmonologist for sleep apnea, Tr. 49-50.  Reed has a CPAP machine for his sleep apnea.  Tr. 56.  He was not using the CPAP at the time of the hearing because of his sinuses which caused him to be unable to breathe with the machine.  Tr. 56-57.  He recently had a procedure to try to help with his sinuses so that he could use the CPAP machine.  Tr. 56-57.

Reed also discussed his back problems, explaining that he has had problems with his back since he was 18 years old.  Tr. 50.  Reed has not had surgery on his back and a surgeon relayed to him that surgery would only have a 50/50 chance of success.  Tr. 50-51.  Reed has tried physical therapy, pool therapy and injections.  Tr. 50-51.  His doctors have suggested a stimulator implant as the next option.  Tr. 50, 55-56.  Reed wears a back brace that he wears except when he is lying down.  Tr. 62.

Reed had a cane with him at the hearing.  Tr. 58.  He indicated that it had been prescribed by a physician but he could not remember who prescribed it.  Tr. 58.  Reed indicated he had had the cane for about four years and he used it to help him with balance and his right foot and back.  Tr. 58.  Years prior, Reed crushed the bone in his ankle.  Tr. 58.  He wears a brace on his ankle.  Tr. 58-59.  Reed had not had surgery on his ankle.  Tr. 58.  He indicated that his physician told him that surgery would be a last resort.  Tr. 58.  Reed said he did not have to use the cane at home but always used it when he went out.  Tr. 59.

---

[5] During the course of his testimony, Reed requested to stand because his legs were hurting and going numb.  Tr. 50, 62.

Reed fractured his left knee about a year prior to the hearing.  Tr. 60.  His knee only bothered him when it was damp or cold.  Tr. 60-61.  He explained that his knee was not as bad as compared to his back, right-foot or left-hip.  Tr. 61.  Reed also has problems with both of his shoulders.  Tr. 61.

Reed explained that he had been dependent on opioids in the past but he had maintained his sobriety since July 5, 2013.  Tr. 51.  He attends AA and NA meetings two or three times each week.  Tr. 52.

Reed receives treatment for mental health issues.  Tr. 54.  He sees Dr. Segraves at Signature Health and he also attends counseling as well.  Tr. 54.  His case manager at Signature is Tim Natale.  Tr. 54.  Reed experiences mood swings; irritability; he gets frustrated and agitated very easily; he cries a lot; he cannot control his moods; and he has panic attacks.  Tr. 54-55.  His panic attacks usually occur when he leaves his home but he does have them at home too.  Tr. 55.  He indicated that sometimes he has panic attacks two or three times each day and sometimes he has them two or three times each week.  Tr. 55.  When he has panic attacks, they typically last from 10 minutes to 2 hours.  Tr. 55.  When Reed has a panic attack, he tries to call his physician, counselor, or AA sponsor. Tr. 55.  Reed takes medication for his mental health issues but does not feel that it helps that much.  Tr. 55.

At the time of the hearing, Reed was living with his mother.  Tr. 47.  He indicated that his mother helps him more than he can help her.  Tr. 52.  Reed's mother does the chores at home and will not let Reed help with them.  Tr. 53.  Reed used to cook in the past but his mother no longer wants him in the kitchen because he left the burner on the stove a couple of times.  Tr. 53.  Reed is able to drive and can drive himself to his own medical appointments.  Tr. 52.  Reed drives his mother to the grocery store and they shop together.  Tr. 52.

Reed does not sleep well because of his sleep apnea.  Tr. 53, 57.  He sleeps between two and four hours each night, with his sleep being broken up.  Tr. 57.  During the day, Reed spends a lot of time lying on the couch or reclining with his legs elevated.  Tr. 53, 60.  He usually naps around noon each day for about 40 minutes to an hour.  Tr. 57.  He estimated spending about 16-18 hours each day lying down or reclining with is feet elevated.  Tr. 53-54.  If Reed does not elevate his legs, his feet swell up really fast and it is "extremely painful."  Tr. 54.

Reed estimated being able to walk the length of a couple of houses before having to stop and rest.  Tr. 59.  Back in 2016, he estimated being able to walk about a block or two.  Tr. 59.  He indicated he could stand for about five minutes before he has to sit down.  Tr. 59.  Sitting is also uncomfortable for Reed and, when he is sitting, he has to get up every 15 or 20 minutes.  Tr. 59-60.

In addition to the AA and NA meetings that Reed attends, Reed attends church on Sundays.  Tr. 62-63.  Reed is unable to kneel at mass.  Tr. 62.  He attends his doctor appointments weekly.  Tr. 62.  Reed used to enjoy painting but is unable to sit long enough in a chair to accomplish anything.  Tr. 63.  Reed generally spends his days talking with his mother, watching television, listening to the radio, or praying and meditating.  Tr. 63.

### 2. Vocational Expert

A Vocational Expert ("VE") testified at the hearing.  Tr. 64-70.  The ALJ explained to the VE that there was no past relevant work.  Tr. 64.  In response to the ALJ's first hypothetical, which described an individual having the same RFC that the ALJ concluded Reed possessed, the VE identified three jobs that the hypothetical individual could perform, i.e., office helper, mail sorter, and hand packager.  Tr. 64-65.

For her second hypothetical, the ALJ asked the VE to consider the first hypothetical except the individual would be limited to standing and walking four hours each day.  Tr. 65.  The VE explained that, with that additional limitation, the described individual would be limited to a light range of work because some occupations are light work due to the lifting requirements rather than the sitting and standing requirements.  Tr. 65-66.   Based on that additional limitation, the VE indicated that the hand packager position would be eliminated but the office helper and mail sorter positions would remain available.  Tr. 66.

For her third hypothetical, the ALJ asked the VE how his answer would be impacted if the individual described in the second hypothetical also needed to use a cane for ambulating on uneven surfaces outdoors and when ambulating 50 feet or more.  Tr. 66.  The VE indicated that that additional limitation would not have any impact on the mail sorter and officer helper positions.  Tr. 66-67.

The VE also explained that, on average, employers allow employees to be off task about 15% of the workday, outside regularly scheduled work breaks.  Tr. 67.  Thus, any one of the individuals described in the three hypotheticals being off task 10% of the day, would generally fall within the customary tolerances for most employers.  Tr. 67.

Reed's counsel asked the VE to consider whether his response to the second hypothetical, which limited the described individual to standing and walking four hours out of an eight-hour workday, would change if the individual also needed to elevate his legs to a 45 degree angle.  Tr. 67-68.  The VE explained that elevation to 45 degrees would not alter his answer.  Tr. 68. However, if the individual needed to elevate his legs to 90 degrees, that would preclude the identified jobs.  Tr. 68.

Reed's counsel then inquired about the impact that the need to alternate between sitting and standing would have on the VE's responses relative to the individual described in the second hypothetical.  Tr. 69.  The VE explained that if alternating between sitting and standing did not take the individual off task for more than 15% of the workday then the jobs could be performed. Tr. 69.  However, if alternating caused the individual to be off task more than 15% of the workday, e.g., if the individual had to walk around in between alternating, than it would be work-preclusive.  Tr. 69.

The VE also indicated that, if an individual required unscheduled breaks beyond the regular morning, lunch and afternoon breaks, such a limitation would be work preclusive.  Tr. 69-70.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her May 14, 2019, decision, the ALJ made the following findings:[8]

---

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

[8] The ALJ's findings are summarized.

1.    Reed has not engaged in substantial gainful activity since April 18, 2016. Tr. 19.

2.    Reed has the following severe impairments: spondylosis of the thoracic spine and lumbar spine (thoracis spine disc bulge and lumbar spine disc extrusion at L4-L5); right foot and ankle fracture with osteoarthritis; greater trochanteric bursitis on the left hip; obstructive sleep apnea; and mood disorders (currently major depressive disorder). Tr. 19. Non-severe impairments included right shoulder dislocations; substance abuse/dependence; agoraphobia with panic disorder; bipolar disorder;[9] anxiety disorder; and personality disorder with antisocial features. Tr. 19.

3.    Reed does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 19-25.

4.    Reed has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) except he can frequently operate foot controls bilaterally; he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; he can occasionally stoop, kneel, crouch and crawl; he can frequently balance; he must avoid jobs that require 1/3 of the day or more to be exposed to extreme cold and respiratory irritants; he must avoid jobs that require work in unprotected heights, operating or being around dangerous moving equipment such as power saws and jack hammers and he is precluded from commercial driving; he is limited to simple routine tasks with no high production quotas; no piece-rate work; no work involving arbitration, confrontation, negotiations, or supervision; interactions with the general public are limited to speaking, signaling, serving and asking questions (as those terms are used by the companion publication to the *Dictionary of Occupational Titles (DOT)*, the Revised *Handbook to Analyzing Jobs)*.  Tr. 25-28.

5.    Reed has no past relevant work.  Tr. 28.

6.    Reed was born in 1966 and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 29. Reed subsequently changed age category to closely approaching advanced age. Tr. 29.

7.    Reed has at least a high school education and is able to communicate in English. Tr. 29.

8.    Transferability of job skills is not an issue because Reed does not have past relevant work.  Tr. 29.

---

[9] The ALJ noted that she considered Reed's bipolar disorder and major depression under mood disorder.  Tr. 19.

9.      Considering Reed's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Reed can perform, including office helper, mail sorter, and hand packager.  Tr. 29-30.

Based on the foregoing, the ALJ determined that Reed had not been under a disability, as defined in the Social Security Act, since April 18, 2016, the date the application was filed.  Tr. 30.

## V. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.**     **The ALJ did not err with respect to her consideration or weighing of the medical opinion evidence**

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).  The "procedural 'good reasons' rule serves both to ensure the adequacy of review and to permit the claimant to understand the disposition of [her] case." *Miller v. Berryhill*, 2018 WL 3043297, * 7 (E.D.Mich., May 29, 2018) (quoting *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 550-51 (6th Cir. 2010)), *report and recommendation adopted*, 2018 WL 3036340 (June 19, 2018).

For claims like Reed's that are filed prior to March 27, 2017, the regulations define a "treating source" as a claimant's "own acceptable medical source" who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §416.927(a)(2).  Thus, where there is no ongoing treatment relationship, an opinion is not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).

Under the regulations in effect for claims filed prior to March 27, 2017, "acceptable medical source" includes licensed physician, licensed psychologist, licensed optometrist but does not include licensed advanced practice registered nurse or social worker.  20 C.F.R. § 416.902(a).  Thus, since an "acceptable medical source" is not considered a "treating source," a nurse's opinion is not subject to controlling weight analysis under the treating physician rule. *See e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor was an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

Reed argues that the ALJ erred with respect to her weighing of the medical opinion evidence.  Doc. 16, pp. 15-24.  He contends that the ALJ improperly discounted opinions regarding his physical impairments rendered by treating medical providers Drs. Sousa and Grieser and erred when she assigned greater weight to opinions of state agency reviewing consultants.  Doc. 16, pp. 16-22.  Reed also argues that the ALJ erred when it rejected the medical opinions rendered by his mental health providers.  Doc. 16, pp. 22-24.

40

### 1. Physical impairment opinions

The opinions that Reed attributes to Dr. Sousa are Exhibit B3F (Tr. 912-913)[10] and Exhibit B31F (Tr. 4893-4894).[11]  The other opinion is a letter authored by Dr. Grieser on April 17, 2018.  Tr. 3395 (Exhibit B15F, p. 1); Tr. 3506 (Exhibit B17F).  The opinions of Drs. Bolz and Klyop are contained in Exhibits B2A (Tr. 469-482) and B4A (Tr. 484-501).

Consistent with the treating physician rule, the ALJ considered and explained the weight assigned to the opinions rendered by Drs. Sousa[12] and Grieser, stating:

> With respect to the medical source statements, Exhibit B3F, dated, February 7, 2017, by an illegible signature, stated the claimant was limited, inter alia, that the claimant could frequently lift zero pounds and could stand one hour per workday. I give this Exhibit little weight because the opinions are not well supported.  The medical source completed a pre-printed form, failed to provide details from treatment notes, used generic words and phrases that could apply to any person with similar conditions and were not entirely specific to the claimant. Moreover, the limitations are entirely out of the realm of reasonably related to the clinical findings. The claimant has a normal gait and normal muscle strength, normal sensations, and normal reflexes.
>
> ***
>
> At Exhibits B15F and B17F, both dated April 17, 2018, Dr. Kathleen Grieser opined:
>
> "Above is under my care. He has chronic venous insufficiency with edema, he may have an additional element of lymphedema, He needs to wear support stockings and should not undergo prolonged standing due to this."
>
> I give these exhibits little weight. First, an ultrasound found, "No evidence of deep venous thrombosis is seen in the vessels examined bilaterally" (Ex. Bl6F page 108). Further, no edema was found in examinations on March 20, 2018 (Ex. Bl6F page 67) and on March 28, 2018 (Ex. Bl6F page 51).  Only trace ankle edema was found on August 17, 2018, and only slight pitting edema with TEDS on August 22, 2018

---

[10] The ALJ notes that the signature on this opinion is not legible.  Tr. 27

[11] The ALJ attributes this opinion to Dr. Grieser.  Tr. 28.

[12] As explained above, it is not clear that Dr. Sousa had a treatment relationship with Reed.  However, for purposes of the Court's analysis, the Court deems the opinions that Reed attributes to being authored Dr. Sousa as authored by a treating physician, which may have been Dr. Grieser.

(Ex. B20F page 4). No edema was found on September 18, 2018 (Ex. B28F page 2). As noted, the claimant's gait is normal.

At Exhibit B31F, Dr. Grieser opined, inter alia, that the claimant can lift less than 5 pounds occasionally and can stand and walk zero hours without interruption.  I give these opinions little weight. Dr. Grieser only gave perfunctory statements for her opinions, which were not supported by clinical findings or references to clinical exams. Further, they are contradicted by the results of the exams performed by Dr. Patel. As noted, the claimant has a normal gait and normal muscle strength, normal sensations, and normal reflexes (Ex. Bl6F and Ex. B20F).

Tr. 27, 28.

The ALJ did not ignore the opinions.  Further, the ALJ explained the reasons for assigning each of the opinions little weight.  Reed challenges the ALJ's rationale, arguing that the ALJ's finding that Reed's gait was normal is inaccurate, pointing to medical examination findings showing an antalgic or altered gait and tenderness and muscle weakness in the lower extremities.  Doc 16, p. 17 (Tr. 1424, 4771, 4775, 4778, 4781, 4785, 4788, 4812).  While there are some abnormal findings throughout the voluminous medical records, there are also normal examination findings, which the ALJ properly relied upon to assess the supportability and consistency of the extreme limitations contained in the medical opinions offered by Reed's treating physicians.   For example, while one of the records that Reed cites to (Tr. 1424, April 20, 2016, Dr. Morton treatment notes) reflects tenderness in the lumbar spine and limited range of motion due to pain, the same record indicates that Reed's gait was normal that day and Reed had 5/5 strength in his bilateral lower extremities.  Tr. 1424.  And another record cited by Reed (Tr. 4812, Dr. Cassell September 18, 2018, treatment notes) reflects tenderness to palpation of low back but Dr. Cassell also observed normal extremities with no edema.  Tr. 4812.

Furthermore, the ALJ cited to specific evidence demonstrating a normal gait and ability to walk without a cane.  *See e.g.*, Tr. 26 (citing Exhibit B16F47 (Tr. 3444, Dr. Patel, March 28, 2018, examination findings, indicating that, although Reed had a cane with him, he was able to

walk without it and had a normal gait); *see also* Tr. 3637 (Dr. Patel August 16, 2018, treatment note, indicating "Gait: Normal gait. Normal station. Brings case but able to walk without cane.").

Reed also argues that there were countless instances when Reed's lower extremities were swollen such that Dr. Grieser's opinion that Reed required support stockings and needed to avoid prolonged standing is supported by the record. Doc. 16, p. 17. However, as outlined in detail above, there are also many instances when medical providers observed no edema or swelling in Reed's lower extremities, some of which the ALJ specifically cited to support her decision. Tr. 28 (citing Exhibit B16F67 (Tr. 3464, Dr. Rainey March 20, 2018, treatment notes); (citing Exhibit B16F51 (Tr. 3448, Dr. Ziv, March 28, 2018, treatment notes).

It is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner,* 745 F.2d at 387. Furthermore, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Thus, even though Reed points to evidence that might support a different result, he has not shown that the ALJ's decision to assign little weight to the opinions of his treating providers, which contain extreme functional limitations, e.g., ability to lift less than five pounds occasionally and walk for zero hours without interruption (Tr. 4893), is unsupported by substantial evidence. Further, the Court finds that the ALJ's decision builds a logical bridge between the evidence and the weight assigned to the opinions of his treating providers.

Also, the Court finds Reed's contention that his vascular insufficiency became so exacerbated that it caused him to fracture his tibial plateau is unsupported by the citations he points to and unsupported by the record as a whole. In support of his claim, Reed cites to Tr.

2912 and Tr. 2913. Doc. 16, p. 17.  However, while those records indicate that a walker was ordered for Reed to use due to his tibial fracture, there is nothing in those records to relate the tibial fracture to venous insufficiency.

The medical records reflect that, in the summer of 2017, Reed sustained the tibial fracture when he fell into rocks at Edgewater Park after his knee had buckled.  Tr. 2964.  At that time, Reed was ambulatory but reported that he had had three months of knee buckling.  Tr. 2964.  In August 2017, Dr. Wera who was treating Reed's tibial fracture noted that an x-ray of the knee showed no further displacement; there was no significant effusion, and the fracture was healing. Tr. 2947.  In October 2017, Reed reported that the knee was "nonpainful" and Dr. Wera concluded that the fracture had healed.  Tr. 3266-3267.  Dr. Grieser's letter indicating that Reed had venous insufficiency was authored in April 2018, six months after the fracture had healed. Tr. 3395.  In light of the record evidence, the Court finds Reed's attempts to tie the opinions regarding venous insufficiency contained in the April 2018 letter to a fracture that occurred as a result of a fall while Reed was walking in a park a year earlier unsupported by the record and misplaced.

Reed also argues that the ALJ erred by assigning greater weight to the opinions of the state agency reviewing consultants.  Doc. 16, pp. 18-19.  The ALJ explained the weight she assigned to Drs. Bolz and Klyop's opinions, stating:

> The reviewing state agency physicians, Drs. William Bolz and Gerald Klyop, did not adopt the RFC found by the prior ALJ. Their rationale was:
>
> "Recent medical evidence of record does not document the degree of impairment seen by the ALJ" (Ex. B2A page 11 and Ex. B4A page 15). I agree. I give their opinions great weight. I see no need to place the limitations upon the claimant's abilities for standing/ambulation, as did the previous ALJ. As noted, the claimant has no gait abnormalities and is able to ambulate without an assistive device (Exs. Bl6F page 47 and B20F page 11). The claimant cannot perform medium or heavy work due to his disc disease. However, he is able to perform light work, with the

limitations cited, due to his normal muscle strength, normal sensations, and normal reflexes (Ex. B16F and Ex. B20F).  The claimant complaints of left hip pain, but his left hip scan was normal (Ex. B16F page 64).

Tr. 26-27.

Reed contends that, because Drs. Grieser and Sousa saw him and treated him for years, the ALJ should have favored the treating physician opinions over the reviewing consultant opinions.  However, an ALJ is not prohibited from assigning more weight to a non-examining physician.  *See e.g., Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("In appropriate circumstances, opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources.") (quoting Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996)).

Reed also argues that the state agency reviewing consultants did not have the entire record before them when they rendered their opinions in 2017, arguing that  the reviewing consultants rendered their opinions "without any knowledge of the host of medical evidence that was added to the record afterwards."  Doc. 16, pp. 19-20.  He references, for example, records documenting his tibial fracture.  However, the tibial fracture occurred in July 2017 and, as of October 2017, Dr. Wera concluded that the fracture had healed.  Tr. 2963-2964, 3266-3267.  And Dr. Klyop considered evidence of left lower extremity fracture when assessing Reed's RFC in October 2017.  Tr.  492, 493.  Moreover, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record."  *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011).  "The opinions need only be 'supported' by evidence in the case record."  *Id.*  Also, there must be "some indication that the ALJ at least considered" the later medical records.  *See Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007); *Blakely*, 581 F.3d at 409 (quoting *Fisk*, 253 Fed. Appx.

at 585).  Here, although the state agency opinions were rendered in 2017 and Reed continued

with treatment after those opinions were rendered, Reed has not shown that the opinions are not

supported by evidence in the record.  Further, while the state agency reviewers did not have the

entirety of the case record before them when they rendered their opinions, the ALJ considered

the later developed record, including his physician's suggestion that a spinal cord stimulator may

benefit Reed.  *See e.g.*, Tr. 22 (discussing Dr. Cassell's indication in September 2018 that Reed

"may benefit from a spinal cord stimulator.") (citing Exhibit B28F page 2 (Tr. 4812)); *see also*

Tr. 21 (ALJ's discussion of other medical records post-dating the consultative reviewing

physicians' RFC assessments).

In challenging the weight the ALJ assigned to the reviewing physicians' opinions, Reed

again takes issue with the ALJ's findings that the evidence showed no gait abnormalities and the

ability to ambulate without an assistive device.  These same arguments were made in connection

with Reed's challenges to the ALJ's treating physician analysis.  And, as discussed in connection

with those arguments, the ALJ cited to specific evidence demonstrating a normal gait and ability

to walk without a cane.  *See e.g.*, Tr. 26 (citing Exhibit B16F47 (Tr. 3444, Dr. Patel, March 28,

2018, examination findings, indicating that, although Reed had a cane with him, he was able to

walk without it and had a normal gait); *see also* Tr. 3637 (Dr. Patel August 16, 2018, treatment

note, indicating "Gait: Normal gait. Normal station. Brings case but able to walk without cane.").

Furthermore, even if substantial evidence or indeed a preponderance of the evidence supports a

claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as

substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

In summary, when weighing the opinion evidence relating to Reed's physical

impairments, the ALJ did not ignore evidence.  Rather, much of Reed's argument for reversal

and remand amounts to a request that the Court consider the evidence anew.  However, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Furthermore, the Court finds that the ALJ adhered to the treating physician rule and relevant regulations when weighing the opinion evidence and the ALJ's decision to assign little weight to the treating physicians' opinion and great weight to the opinions of the state agency reviewing consultant opinions is supported by substantial evidence.

### 2.  Mental impairment opinions

Reed also challenges the ALJ's decision to assign little weight to the opinions regarding his mental health limitations that were co-signed by Dr. Segraves.  Doc. 16, pp. 22-24. Consistent with the regulations, the ALJ considered and weighed Dr. Segraves' opinions, stating:

> Exhibit B4F, dated February 24, 2017 and Ex. B30F, dated November 1, 2018, are both mental capacity forms countersigned by Dr. Segraves. These exhibits state the claimant has marked and extreme limitations in various mental health Domains. I assign little weight to the exhibits.  Again, these are completed pre-printed forms that failed to provide details from treatment notes, that uses generic words and phrases that could apply to any person with similar conditions and were not entirely specific to the claimant.  Dr. Segraves provided scant and generic narrative explanation to support their check-marks on the form--and the form clearly stated more was required:  "It is imperative that you provide an explanation of the medical and clinical findings that support your assessment of limitations a simple recitation of the diagnosis will not be sufficient to comply with Social Security's Regulations." Further, the opinions in these exhibits are contradicted by Dr. Segraves' own reports concerning the claimant. At Exhibit B8F, Dr. Segraves reported:
>
> ""the claimant's had a despondent mood and affect
> The claimant was socially withdrawn
>
> The claimant had a normal appearance
> The claimant had no thought disorder
> The claimant was oriented
> The claimant's judgment was fair
> The claimant had a normal ability to remember, understand and follow directions
> The claimant had a normal ability to maintain attention
> The claimant could cope at normal paced jobs
> The claimant could perform simple, repetitive tasks" (Ex. B8F).

At Exhibit B29F, Dr. Segraves reported:

> ""The claimant had a dysphonic mood and affect
> The claimant was oriented and cooperative
> The claimant had sustained attention/concentration
> The claimant had normal speech and language
> The claimant's thought processes were normal
> The claimant had normal associations
> The claimant has no psychosis
> The claimant's fund of knowledge was normal
> The claimant's remote and recent memory were intact
> The claimant's insight and judgment were normal' (Ex. B29F page 33).

These clinical findings contradict an opinion that the individual would have marked and extreme mental health limitations.

Tr. 27-28.  Also, in connection with weighing the medical opinion evidence regarding Reed's mental limitations, the ALJ stated:

> Since the prior Decision, there have been no psychiatric hospitalizations and no contact with the criminal justice system.  Most of the medical records document treatment to maintain sobriety. The claimant's neuropsychological testing showed only mild attention deficit (Ex. B32F page 4). Dr. Segraves reported the claimant could remember, understand, and follow directions. He reported the claimant was capable of simple and repetitive tasks (Ex. B8F). He cares for his elderly mother, shops, drives, tends his personal care, prepare meals, and handles his finances (Ex. B4E). Other than changing some verbiage, I find no reason to change the mental limitations found by the previous ALJ (AR 98- 4 (6)).

Tr. 27.

Reed argues that "ALJ Loucas's rationale for rejecting this treating source opinion is flimsy, and premised on selectively picked mundane activities such as driving and preparing meals. These selected pieces of evidence do not demonstrate that the substance of the evidentiary record establishes that Mr. Reed is capable of sustaining full-time work."  Doc. 16, p. 24. However, as reflected above, the ALJ's rationale consisted of more than Reed's ability to drive and prepare meals.  The ALJ considered the supportability and consistency of the opinions with the other evidence of record.  For example, the ALJ considered Dr. Segraves' own mental

examination findings.  Tr. 27-28.  Also, the ALJ considered neuropsychological testing that showed only mild attention deficits.  Tr. 27 (citing Exhibit B32F page 4 (Tr. 4898)).  The ALJ also took into account that the opinions lacked detailed supporting explanations from treatment notes to support marked or extreme limitations.  Tr. 27-28.

While Reed cites to other evidence in the record that he contends supports greater mental health limitations than those found by the ALJ (Doc. 16, p. 23), it is not for this Court to "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Furthermore, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Reed has not shown that the ALJ failed to consider evidence.  Also, Reed has not shown that the ALJ failed to satisfy the treating physician rule when weighing Dr. Segraves' opinions and he has not shown that the ALJ's decision is not supported by substantial evidence.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: March 26, 2021                                   */s/ Kathleen B. Burke*
                                                        _____
                                                        Kathleen B. Burke
                                                        United States Magistrate Judge